# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                          )
                                                )
CLEARWATER DEVELOPMENT, INC.                    )
EIN: 20-1538160                                 )          Case No.  11-18725-HRT
                                                )          Chapter 11
                                                )
                            *Debtor.*           )

---

## COVER SHEET FOR MOTION SEEKING EXPEDITED ENTRY OF ORDER(S) AND NOTICE OF IMPENDING HEARINGS THEREON

---

      The Debtor in the above-captioned Chapter 11 case filed on April 18, 2011, hereby requests the Court to enter the Orders listed below on an expedited basis, pursuant to L.B.R. 2081-1. **THE DEBTOR HAS FILED A MOTION SEEKING EXPEDITED ENTRY OF THE FOLLOWING ORDER(S):**

1.  _X_  Order establishing Limited Notice List.

2.  _X_  Interim Approval of Post Petition Secured and Superpriority Financing Pursuant to Section 364(d) of the Bankruptcy Code.

3.  _X_  Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CLEARWATER DEVELOPMENT, INC. | ) | CASE NO. 11-18725-HRT |
| EIN: 20-1538160 | ) | CHAPTER 11 |
| *Debtor.* | ) | |

## MOTION SEEKING EXPEDITED ENTRY OF ORDERS

Clearwater Development, Inc., debtor-in-possession ("*CDI*"), by and through its counsel, Connolly, Rosania & Lofstedt, P.C., hereby files its Motion seeking Expedited Entry of Orders and for Final Approval of Such Orders (the "*Motion*"). In support of the Motion, CDI states as follows:

## I. INTRODUCTION

1. CDI files the Motion pursuant to Local Rule 2081-1. CDI seeks entry of the following orders on an expedited basis:

    a.    Order Establishing Limited Notice List

    b.    Order Approving Postpetition Secured and Superpriority Financing in Initial and Final Advances

    c.    Order Determining Adequate Assurance of Payment of Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service

2. The relief sought herein is needed on an expedited basis to ensure uninterrupted company operations. Each requested relief set forth herein is separately identified and discussed as required under Local Rule 2081-1. Proposed forms of order, in substantial conformity with applicable local rules, are submitted herewith.

3. With respect to all relief requested herein on an interim basis, CDI also requests the scheduling of a final hearing to consider the relief requested and the entry of final orders and approving the form of notice with respect to the Final Hearing.

## II. BACKGROUND

4.     CDI, a Colorado corporation, filed a Chapter 11 bankruptcy protection on April 18, 2011 (the "*Petition Date*").  CDI continues to maintain possession of its property and operate its business as debtor-in-possession 11 U.S.C. Sections 1107 and 1108.  No creditors committee has been appointed in this Chapter 11 case.

5.     CDI owns a 963 acre golf course real estate development near Gypsum, Colorado (the "Property").  The Property includes a real estate development known as the Brightwater Club, an 18-hole golf course, and a gated community with 535 home sites.  The Property is located in the Gypsum Creek Valley 35 miles from Vail, Colorado, with easy access to Interstate 70 and the Vail airport.

6.     CDI filed Chapter 11 in order to sell its assets for the highest and best price as a going concern as expeditiously as possible.

7.     The Brightwater Club began in 2005 with market acceptance.  It has 95 acres of dedicated open space for hiking and fishing and 25 acres of lakes and streams.  It has The Lake House for casual dining and The Cast Off Cabin, a secluded retreat on Gypsum Creek, for fly fishing or reading.

8.     CDI had 195 home site sales in its first 2 and 1/2 years from buyers from 18 states.  The initial sales prices and volume exceeded the pro forma by 75%.

9.     The Brightwater Club golf course, designed by Robert Trent Jones, Jr., opened the front nine holes in 2008 and has not been open for play in 2009 or 2010. The Property includes an 18-hole putting course and extensive practice area.

10.    The Property which is the subject of this case includes 50 finished single family home sites, 65 partially finished single family home sites, 225 entitled single family home sites, completed 18 hole Robert Trent Jones Jr. golf course, completed 18 hole putting course, 25 acres of lakes, significant water rights, Cast off cabin, Lake House Restaurant and Club and all entitlements, permits and development rights.

11.    CDI experienced difficulties in 2006 when developer financing was suspended forcing a halt in home site and amenity development due to cost overruns and lender issues.  The sales momentum was slow to recover due to the halt in development despite bridge financing and a new development loan in 2007.

12.    Then, the 2008 real estate and financial markets meltdown stopped all sales and development.

13.    The cost of the Property was approximately $60,000,000, it was appraised at the time of the loan at $100,000,000 and current value is approximately $8,000,000.

14.     The Property is subject to a first and perpetual lien in favor of Eagle County, Colorado for unpaid real property taxes in the amount of approximately $1,400,000, inclusive of obligations owing to the Valagua Metropolitan District, Eagle County, Colorado, General Obligation Limited Bonds Series 2008 and mechanics lien claims in the total amount of approximately $1,700,000, plus attorneys fees and interest, for which such mechanics' lien claimants hold a judgment from Eagle County District Court determining the principal amount of such mechanics lien claims are superior to the clams of the Lenders.

15.     Some of the Property is subject to judicial and statutory liens in favor of the Brightwater Property Owners Association ("POA") for an aggregate debt in the amount of approximately $230,000.

16.     The Property is also subject to a syndicated loan and first deed of trust (the "*Loan*").  The outstanding balance on the Loan is approximately $37,800,000 in principal and $20,000,000 in default interest.  The current participating lenders holding lender interests in the Loan and their approximate ownership interests are, to CDI's knowledge (collectively the "*Lenders*"):  (i) KD8 LLC (43.53%); (ii) Brookline Financing, LLC (47.04%); (iii) Sharon Berger (0.5%); (iv) WVM Group, LLC (0.5%); (v) J.K.G. Financing, Inc. Defined Benefit Plan (2.0%); (vi) Murray L. Beer Family Trust (4.0%); (vii) MMR Funding, LP (2.0%); and (viii) Flug Funding, Inc. (0.43%).  CDI is further informed and believes that the interest of Brookline Financing, LLC ("*Brookline*") is held by Fortis Bank S.A./N.V.("*Fortis*") as collateral for a loan by Fortis to Brookline to secure funding used by Brookline to acquire its interest in this Loan and other loans.  CDI is informed and believes that Kennedy Funding, Inc. is the servicing agent for the Loan

17.     CDI has been unable to agree on any restructuring strategies or effectively communicate with the Lenders over the last eighteen month period.  The inability of CDI and the Lenders to effectively communicate and agree on a restructuring has created a negative cloud over CDI and the Brightwater Club.  Property and prospective property owners are anticipating a foreclosure or restructuring that has not occurred and there have been piecemeal foreclosure sales of lots.

18.     Russ Hatle and Jim Higgins, who directly or indirectly own stock in CDI, have created an entity, Hearthstone Investors, LLC ("Hearthstone"), in which they own a small minority interest, which has raised funds to be loaned to another entity in which they have a minority interest, Reconcile, LLC ("Reconcile").  Reconcile will be a stalking horse bidder for the assets of CDI.  Reconcile will make an opening bid of $7,530,000 for the Property.  Motions for the sale of assets and for approval of bid procedures are being filed contemporaneously with this motion.  Otherwise, the project is stymied and completely unable to move forward.

19.     CDI is seeking authority, pursuant to the "first day" DIP financing motion, to borrow up to approximately $597,000 as an Initial Advance and $1,883,000 as a Final Advance from EFO Financial Group, LLC ("EFO").  CDI has no present source of income.  The Initial Advance should meet CDI's immediate cash needs for chief restructuring officer fees, bankruptcy professional fees, various DIP loan fees and funds to jump start the operations, the

golf course and marketing.  CDI is in urgent need of such financing and will be harmed if it does not have access to immediate funding.

20.     Prior to filing, James DeFrancia was appointed as Chief  Restructuring Officer ("CRO") of CDI, as part of the restructuring efforts, at a salary of $25,000 per month for five months.

## III. RELIEF SOUGHT ON AN EXPEDITED BASIS

### A.  MOTION FOR ORDER ESTALBLISHING LIMITED NOTICE

21.     CDI seeks entry of an order establishing a limited notice list pursuant to Local Rule 2081-2.

22.     Cause for the limited notice list is shown as follows: as set forth in CDI's initial bankruptcy filings, the estate has over 500 creditors and interested parties.

23.     CDI requests that the limited notice apply to all pleadings and motion filed in the case that require notice or "notice and a hearing" under an applicable statute, rule or court order.

24.     CDI seeks to place the following creditors and parties on the limited notice list:

(a) the United States Trustee;

(b) any appointed chapter 11 trustee or examiner;

(c) any appointed committee of creditors and/or equity security holders;

(d) if there is no creditors' committee the 20 largest unsecured creditors;

(e) all secured creditors;

(f) the Internal Revenue service;

(g) the Colorado Department of Revenue ;

(h) any parties who file an entry of appearance and request for all notices;

(i) parties against whom relief is sought by the particular intended action;

(j) any additional parties as directed by the Court.

### B.  MOTION FOR INTERIM AND FINAL ORDER APPROVING
###     POSTPETITION SECURED  AND SUPERPRIORITY FINANCING

25.     CDI requests interim and final approval of post-petition secured and superpriority financing from EFO as set forth below.

4

26.     CDI's prepetition secured indebtedness is described in paragraphs 14, 15 and 16 above.

27.     On or about April 21, 2011, CDI entered into a loan commitment with EFO (the "DIP Financing Agreement"), a copy of which is attached hereto and incorporated herein as "Exhibit 1".

28.     Pursuant to Bankruptcy Code Section 552(a), the Lenders will not have an interest in property of CDI acquired after the Petition Date.

29.     CDI has no cash with which to operate its business.  In order to avoid immediate and irreparable harm to CDI and its assets, including the golf course, CDI seeks entry of a final order (the "Final Order") in the form attached hereto.  Approval of the DIP Financing Agreement is in the best interest of CDI, the estate and its creditors as it will allow CDI to maintain and preserve its assets, including the golf course, with an opportunity to sell such assets as a going concern.

30.     The DIP Financing Agreement includes the provisions of the type indicated in the appendix to the Local Rules at L.B.R. 4001-3(a)App.

31.     In accordance with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-3, the material provisions of the proposed DIP Financing Agreement between CDI and EFO are summarized as follows.

32.     The Maximum Borrowing Available on a Final Basis is $2,480,000.

33.     The DIP Financing Agreement will be used for the Budgets (the "Budgets") attached to the DIP Loan Commitment as "Exhibit A".  The first part of "Exhibit A" contains a thirty day budget for the Initial Advance in the amount of $597,000.

34.     The Initial Advance shall be $597,000.  "Exhibit A sets forth CDI's thirty day cash needs and includes a $23,865 commitment fee (4%), a $20,000 one-time loan servicing fee, $11,933 in loan closing costs, a twelve month interest escrow $83,528, $10,000 for marketing and public relations, $25,000 in CRO fees, $75,000 of legal fees for counsel for CDI and the unsecured creditors' committee, $20,000 to reimburse for loan application fee and EFO's legal fees, and $337,300 in general and administrative, marketing and golf course operations.

35.     The Interest Rate is 14%.

36.     The Maturity Date is the earlier of payment of the DIP Financing Agreement from a successful asset sale or one year.

37.     The Loan Fee is 4% of the principal balance or $99,200, payable at the times of the advances.  EFO is also entitled to a one-time $20,000 loan closing fee, a twelve month interest reserve in the amount of $347,256, and closing costs in the amount of $49,608, for a total of $516,064.

38.     CDI will use the proceeds of the DIP Financing Agreement in accordance with the Budgets.  The five month budget items include approximately $1,329,319 to support the operations of the golf course for one season and general and administrative expenses, approximately $70,000 for marketing, approximately $125,000 for the CRO, approximately $516,064 in dip loan fees, closing fees, closing costs and the interest reserve, $30,000 to reimburse for the loan application and lender's counsel's legal fees, approximately $375,000 in professional fees for the bankruptcy case and $35,000 in consulting fees.

39.     **EFO shall receive, pursuant to Bankruptcy Code Sections 364(c) and (d), a valid, perfected, enforceable and non-avoidable first priority senior liens and security interests in** all now owned and hereafter acquired assets and property of CDI, including the Property, whether existing on the Petition Date or thereafter acquired, and all the proceeds, products, rents, substitutions, accessions and profits from all of the foregoing, wherever located, **subject only to** the first and perpetual lien of Eagle County, Colorado, for unpaid real property taxes. The obligations of CDI under the DIP Financing Agreement will have superpriority status over any and all other administrative expenses pursuant to Bankruptcy Code Section 364(c)(1). The legal description of the real property is attached hereto as "Exhibit B-1".

40.     CDI must obtain the Final Order as a condition for funding the DIP Financing. The foregoing summarizes the DIP Financing proposal, but to the extent inconsistent with the attached Commitment Letter, the Commitment Letter controls.

41.     There are no events of default.

42.     Bankruptcy Code Sections 364 (c) and (d) provide if a debtor is unable to obtain unsecured credit allowable as an administrative expense, or credit with priority over any or all administrative expenses secured by property of the estate that is not otherwise subject to a lien, or credit secured by a junior lien on property of the estate that is subject to a lien, the Court may authorize the obtaining of credit secured by a senior or equal lien on such property of the estate subject to a lien.

43.     Bankruptcy Rule 4001(c)(1) details the procedure for obtaining authorization to obtain postpetition financing and provides in relevant part that Court may conduct a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. However, the Court may authorize the obtaining of credit necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

44.     CDI has not been able to obtain financing on any other basis from any other source other than that set forth in the DIP Financing Agreement.  The lien of Eagle County, Colorado, is not primed.  The mechanics' lien claimants consent to this Motion and the Lenders are adequately protected because they are retaining their secured claim, the DIP Financing Agreement funds the costs of a sale of the Property and prevents further diminution of the value of the Property. Finally, CDI and the Lenders are currently in deadlock.

45.     Absent entry of the Order, EFO will not enter in the DIP Financing Agreement, advance funds or provide financing to CDI.  The terms set forth herein, the DIP Financing

Agreement and EFO's consent to the entry of the proposed Order were each negotiated in good faith under Bankruptcy Code Section 364(e). Accordingly, EFO is entitled to the protections of Bankruptcy Code Section 364(e).

46.     Bankruptcy Rule 4001(c)(1) permits the Court to schedule a hearing on a motion for approval of postpetition financing on an expedited basis of the motion so requests. Pursuant to Bankruptcy Rule 4001(c)(1), CDI specifically requests the motion be heard on an expedited basis.

### B. MOTION FOR INTERIM AND FINAL ORDER DETERMINING ADEQUATE ASSURANCE OF PAYMENT OF FUTURE UTILITY SERVICES AND RESTRAINING UTILITY COMPANIES FROM DISCONTINUING, ALTERING OR REFUSING SERVICE

47.     CDI requests an Order from the Court restraining utility companies from discontinuing, altering or refusing service as provided below.

48.     Prior to the Petition Date, CDI used the following utilities in its operations at the Facility:

| Utility | | Utility Company |
|---|---|---|
| A. | Electricity | Holy Cross Energy |
| B. | Gas | SourceGas |
| C. | Telephone | San Isabel Telecom |
| D. | Water | Town of Gypsum |
| E. | Internet | CenturyLink |
| F. | Sewer | Town of Gypsum |

49.     CDI will need uninterrupted utilities from the "Utility Companies" identified above to operate its business. Pursuant to Bankruptcy Code Section 366(c)(3), CDI requests modification of the amount of assurance required to be made to the Utility Companies under Bankruptcy Code Section 366(c)(2). CDI requests that the Court not require CDI to make a security deposit or any other form of adequate assurance. CDI did not have security deposits with the Utility Companies prior to the Petition Date and CDI intends to pay for Utilities as the utilities come due in the ordinary course of business. The Utility Companies will have an administrative expense claim under Bankruptcy Code Section 507.

50.     In the alternative, if the Court determines that some deposit is required, CDI requests that the Court determine that a one month security deposit will provide adequate assurance and further requests that the Court allow CDI to pay the one month security deposits in three equal installments on May 1, June 1, and July 1, 2011. If required, the one month security deposit will be determined by averaging the last twelve months of services for each Utility Company. If required, the security deposit will serve as a cash security deposit to provide adequate assurance of payment for utility services provided to CDI after the Petition Date. If CDI fails to pay for the utility services within the normal time period allowed for customers of that Utility Company, the Utility Company would be permitted to utilize the security deposit to

pay for such services and CDI will be required to replenish the security deposit no more than 15 days after notice from the Utility Company that it has applied the security deposit to the unpaid services.

51. Therefore, in accordance with Bankruptcy Code Section 366(a), CDI requests that the Utility Companies be prohibited from altering, refusing or discontinuing Utility Services to CDI absent further Order of the Court.

52. The relief requested herein strikes a balance between the need to provide adequate assurance to the Utility Companies of payment for post-petition services and causing an undue burden on the operations of CDI. CDI will be operating under the Budget and requiring it to pay further adequate assurance will work an undue hardship on it by tying up unnecessary capital. The relief requested herein is necessary to avoid immediate and irreparable harm to CDI.

**WHEREFORE**, Debtor requests that the Court enter an interim order on an expedited basis and a final order as follows:

> a. Establishing a Limited Notice List;
>
> b. Approving Postpetition Secured and Superpriority Financing;
>
> c. Determining Adequate Assurance of Payment of Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service.

Date: April 21, 2011.                    Respectfully submitted,

CONNOLLY, ROSANIA & LOFSTEDT, P.C.

By:    */s/ Joseph G. Rosania*
       Joseph G. Rosania, Esq. #12499
       950 Spruce Street, Suite 1C
       Louisville, CO 80027
       (303) 661-9292
       (303) 661-9555 – fax
       joe@crlpc.com

*Attorneys for Clearwater Develpoment, Inc.*

8

Exhibit "1"

 **EFO** Financial Group, LLC

**9180 Galleria Court, Suite 600**
**Naples, Florida 34109**
Tel: 239-449-1811; Fax: 239-449-1810

April 19, 2011

Mr. Russ Hatle
Clearwater Development, Inc.
4000 Gypsum Creek Road
Gypsum, Colorado 81637

**In re:** **Financing Request for a Chapter 11 Debtor-In-Possession Term Loan in the maximum principal amount of $2,480,400 (Including Fees, Costs and Expenses to be Paid) to be provided by Lender to Clearwater Development, Inc., Case No. 11-18725.**

Gentlemen:

In reference to the above-captioned matter, the undersigned is pleased to provide this non-assignable pre-petition commitment (this "Commitment") to Clearwater Development Inc., for a debtor-in-possession term loan (the "Loan") upon the terms and conditions described below.

**LENDER:** **EFO Financial Group, LLC,** a Florida limited liability company, and/or its participants or assigns ("Lender").

**BORROWER:** **Clearwater Development Inc.,** a Colorado corporation ("Borrower"), debtor and debtor-in-possession.

**AMOUNT OF**
**LOAN/ADVANCES:** The maximum aggregate principal amount of the Loan shall be **$2,480,400,** which amount includes the Interest Reserve (defined below), the Commitment Fee (defined below), the Loan Servicing Fee (defined below), and the Closing Costs (defined below) which, together with any other fees or costs as provided herein and/or in the Loan Documents (defined below), shall collectively be referred to as the "Maximum Loan Amount", which sum shall be loaned as follows:

1

A.     The Loan shall be proposed to the Bankruptcy Court in two tranches, an Initial advance of $584,127 (the "Initial Advance") and a final advance of $1,896,273 (the "Final Advance"). Upon entry of Initial and final orders of the Bankruptcy Court issued in Case Number 11-18725, pending in the United States Bankruptcy Court (the "Bankruptcy Case") satisfying the requirements of this Commitment and granting the liens and other rights described herein, which final order has not been appealed, modified, stayed, vacated or reversed (the "Final Order"), and upon satisfaction of all conditions and requirements of this Commitment and of the Loan Documents to be approved by the Bankruptcy Court and executed by the Borrower (see below), the Lender will make the Loan in the maximum aggregate principal amount of **$2,480,400**, the Loan to include the Interest Reserve Account (defined below), the Commitment Fee (defined below), the Loan Servicing Fee (defined below), the Closing Costs (defined below), together with any other costs as provided herein and/or in the Loan Documents.  Said funding may be provided in one or more disbursements, pursuant to the Budget (defined below), in Lender's discretion, directly to the Lender, Borrower or third parties or into the Escrow Account (defined below) and disbursed therefrom upon written request of Borrower, within five (5) business days after receipt of such written request of Borrower, not more frequently than once per calendar month, with each disbursement in an amount of not less than $100,000. Except as otherwise provided herein, in the Lender's discretion, in no case shall the Lender be required to advance more than the Maximum Loan Amount. Interest shall accrue on funds disbursed into the Escrow Account as of the date of transfer of funds into the Escrow Account.

B.     In addition, Lender may make advances on the Loan, in Lender's discretion and without further order of the Bankruptcy Court, to pay Lender's costs and expenses incurred both in connection with closing of the Initial Advance and the Final Advance and in connection with the Bankruptcy Case (in each case including, but not limited to, reasonable fees and costs of the Lender's counsel) and protection of Lender's collateral, which advances may collectively result in a sum in excess of the maximum aggregate principal amount of **$2,480,400** and shall become part of the principal amount of the Loan.

**TERM:**     The maturity date of the Loan shall be the date which is twelve (12) months after the date of the closing of the Initial Advance of the Loan (the "Maturity Date").

**PREPAYMENT:**     Borrower may prepay the Loan at any time. In the event of a prepayment, the Commitment Fee, the Closing Costs or other costs paid pursuant to the terms hereof and in the Loan Documents shall not, under

any circumstances, be refunded. Should prepayment occur within the first one hundred eighty (180) days after the date of closing of the Initial Advance, the Lender shall retain and earn, in full, one hundred eighty (180) days of the prepaid interest, computed at the Contract Rate (defined below) on the Maximum Loan Amount.

**BUDGET/USE OF PROCEEDS:** Loan proceeds shall be used by Borrower in accordance with the budget and in substantially the same form as that which is attached hereto as Exhibit A (the "Budget"), which Budget may be modified as approved by Lender on or before the date of the hearing before the Bankruptcy Court for approval of this Commitment and the Loan. It is anticipated that upon Lender's determination, in its sole and absolute discretion, that all conditions precedent to funding applicable to the Initial Advance and Final Advance in accordance with the terms of this Commitment, the Final Order and the Loan Documents have been satisfied, the entire aggregate principal amount with respect to the Intitial Advance and the Final Advance of the Loan (except the Commitment Fee, Interest Reserve, Loan Servicing Fee and Closing Costs line items in the Budget [hereafter "Loan Expenses"] which shall be paid directly to Lender or such third parties as is appropriate) shall be disbursed into an escrow account from which draws shall be disbursed (the "Escrow Account") in accordance with the terms of this Commitment, the Final Order and the Loan Documents.

**INTEREST/ INTEREST RESERVE:** A.     The interest rate shall be fourteen percent (14.00%) per annum (hereafter the "Contract Rate").

B.     Monthly payments of interest only on the unpaid principal balance shall be due on the first day of each month for the prior month's interest until the Maturity Date of the Loan, at which time the entire balance of principal and accrued unpaid interest thereon together with any costs and expenses then owing, shall be due and payable in full. To the extent of the balance therein, monthly payments of interest shall be made from funds set aside in the Escrow Account and reserved for the payment of interest from the date of Closing through the Maturity Date (the "Interest Reserve"), provided, however, that nothing herein shall relieve the Borrower of the absolute obligation to pay interest and other amounts due in connection with the Loan.

C.     Monthly payments will be computed on a 30-day month and a 360-day year, unless such computation results in the effective interest rate of the Loan exceeding the maximum rate of interest allowable under

3

applicable state and federal law. It is hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

D.     Upon occurrence of an event of default, interest shall accrue to the Lender at the lower of the sum of the Contract Rate and an additional ten percent (10.00%) for a total default rate of twenty four percent (24.00%) or the maximum effective interest rate allowable under applicable state or federal law on all amounts then outstanding from the date of default ("Default Rate"). Without limiting the generality of the foregoing, payments made more than five (5) business days past their due date shall be deemed to be in default and shall be assessed at the Default Rate. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by state or federal law. Furthermore, nothing herein shall relieve the Borrower of the absolute obligation to pay interest and other amounts due in connection with the Loan.

**LOAN SERVICING FEE:**     At the time of funding of the Initial Advance of the Loan, from the proceeds such advance, Borrower shall pay to Lender a loan servicing fee in the amount of twenty thousand dollars ($20,000.00) (the "Loan Servicing Fee"), due and fully earned at closing.

**COLLATERAL/ OTHER RIGHTS:**     A.     The Loan shall be secured by a first priority mortgage (or deed of trust or similar security instrument) lien on all of the real property which the Borrower owns and all other property interests, real, personal or intangible of the Borrower, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired post-petition (hereafter collectively referred to as the "Collateral"). The Collateral shall include, but not be limited to, (i) fifty (50) developed single family home sites, (ii) sixty five (65) partially finished single family home sites, (iii) two hundred twenty five (225) entitled single family homesites, (iv) completed 18-hole Robert Trent Jones Jr. golf course, (v) completed 18-hole putting course, (vi) twenty five (25) acres of lakes, (vii)

4

water and sub terraneous mineral rights, (viii) completed lake house restaurant and club, (ix) cast off cabin, and (x) all entitlements, permits, and development rights collecitevly encompassing approximately nine hundred sixty three (963) acres located within the Gypsum Creek Valley in the State of Colorado, more particularly described on **Exhibit B** attached hereto (hereafter, the "Project").

The priming mortgage liens and security interests in favor of Lender shall be senior to any and all other liens, mortgages and security interests encumbering said Collateral pursuant to 11 U.S.C. §§ 364 (d) and 364(c)(2). Lender's mortgage liens and security interests in the Collateral shall be senior to all other interests of any party, including, without limitation, tax liens (except ad valorem taxes and existing Valagua Metropolitan District, Eagle County, Co, General Obligation Limited Tax Bonds, Series 2008 ["C.I.D." liens] which C.I.D. liens shall have no right of acceleration upon default, said ad valorem and C.I.D. liens being hereafter referred to as the "Excepted Liens"), the declaration of condominium, if any, and related instruments, and any and all covenants, deed restrictions, equitable servitudes or other rights in such Collateral as may be acceptable to Lender, its counsel and the Title Company (defined below).

B.    In addition, as a condition precedent to Lender's obligation to make the Loan and as a material inducement to the Lender, the Lender shall also receive a superpriority administrative expense in the Bankruptcy Case pursuant to 11 U.S.C. §§ 364(c)(1), 503(b) and 507(b), with priority over all other administrative expense claims in the Bankruptcy Case except fees payable to the Office of the United States Trustee, and the Lender shall not be required, without its consent, to accept property other than cash in satisfaction of (a) its liens and security interests which encumber the Collateral as security for payment of the Loan and (b) the super-priority administrative expense claim, notwithstanding 11 U.S.C. § 1129 (a)(7) or (b)(2)(A) . The Borrower hereby agrees not to seek to modify, reduce, impair, alter, extinguish or otherwise change either the priming lien or superpriority administrative expense claims of the Lender pursuant to any provisions of Title 11 or other applicable law. None of the Lender's rights as set forth herein may be modified except with the express written consent of the Lender.

C.    Lender's mortgage liens and security interests shall not be primed, surcharged, altered or impaired, marshaled or otherwise adversely affected in any way, whether requested by a creditor of the Borrower or any other party. No claim or expense shall have priority over, or be *pari pasu* with, Lender's rights in the Collateral. Except as provided in the

immediately preceding paragraphs A and B, no administrative expense, and no claim allowed and payable under 11 U.S.C. §§ 330, 331, 503(b) 506(c), 507 or 726, shall have priority over, or be pari pasu with, the Lender with respect to any asset of the Borrower which constitutes either the Collateral pursuant to 11 U.S.C. §364(d) or with respect to the claims of the Lender pursuant to 11 U.S.C. §364(c)(1).

D.    The Final Order authorizing the first priority liens and super-priority administrative expense claims in favor of the Lender and incorporating the terms and requirements of this Commitment, shall also contain both a finding by the Bankruptcy Court that the extension of credit and making of loans by Lender hereunder to Borrower is being made in good faith and, therefore, Lender shall be entitled to the full protections of 11 U.S.C. §364(e) and shall be made effective immediately without any stay of the effect of such Final Order so as to permit, in Lender's sole discretion, immediate funding within the provisions and protections of 11 U.S.C. §364(e).

**COVENANTS:**    In addition to all standard covenants required by the Lender in debtor-in-possession construction loans made under like circumstances, including all standard commercially appropriate terms in the Lender's absolute discretion, the Lender will require that:

A.    Borrower shall: (a) own the Collateral, (b) disburse funds for the payment of expenses only as set forth in the Budget, (c) comply with all provisions of the Final Order, this Commitment and the Loan Documents, (d) present to the Lender such additional instruments as may be required for endorsements to the Title Insurance Policy as Lender may require insuring that all advances of the Loan subsequent to the Initial Advance retain the lien priority described therein and that either the Lender's liens have priority over mechanic's lien claims or unpaid Notices to Owner applicable to the Collateral as provided by the Final Order or any such mechanic's lien claims or unpaid Notices to Owner are not excepted from the applicable Title Insurance Policy referred to above, and (e) notify Lender in writing of any material adverse change in the Collateral, the financial condition of the Borrower or the financial viability or performance of the Borrower's property, or of economic conditions which may materially adversely affect the value or performance of the Borrower's property.

B.    Borrower shall supply to Lender: (A) on or before the 15th day of each month during the term of the Loan, a receipts and disbursements statement relating to the operation of the Collateral including the use of Loan proceeds; (B) on or before the 15th day of each month during the

term of the Loan, a schedule reflecting both all available Loan proceeds, not yet disbursed, and all outstanding costs; (C) within three (3) days after Borrower receives a copy of the same, copies of any and all appraisals of any of the Borrower's property and/or equipment; and (D) all information reasonably necessary for Lender to monitor its Loan to Borrower.

C.     So long as any portion of the Loan remains outstanding, the Borrower shall not seek or permit, and shall actively object to the request for entry of, (i) an order dismissing or converting the Bankruptcy Case or appointing a Chapter 11 trustee or (ii) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to superpriority administrative status equal to or superior to that granted to Lender.

**DEFAULT/
REMEDIES:**

A.     The Loan Documents shall contain events of default and remedies customarily required by Lender in its absolute discretion in transactions such as the Loan.

B.     In addition to other rights and remedies available under the Loan Documents or applicable law, upon occurrence of an event of default:

i) Lender, if it seeks to exercise its rights and remedies under the Loan Documents with respect to the default, shall provide written notice (the "Written Notice") to the Borrower, the Borrower's counsel of record in the Bankruptcy Case, the United States Trustee, all entities scheduled by the Borrower as secured creditors of the Borrower in the Bankruptcy Case, and counsel (if any) for the official committee of unsecured creditors, and shall file an affidavit with the Bankruptcy Court specifying the default. The Written Notice may be any written document providing notice of default, including but not limited to the affidavit filed with the Bankruptcy Court.

ii) Any party entitled to the Written Notice shall have five (5) business days from the receipt of the Written Notice in which to cure the default or file a controverting affidavit with respect to the default.

iii) If the default is not cured within the prescribed five (5) business day period, Lender may file an emergency motion for relief from the automatic stay, and the Bankruptcy Court will set an expedited hearing on 48 hours notice to determine whether Lender shall be granted

7

relief from the automatic stay to foreclose on its liens or take any other action available to Lender under the Loan Documents and applicable law. At the hearing the Borrower may only contest the Lender's declaration of the default and may not assert any other or additional defenses.

C.        The entire principal balance of the Loan, plus all accrued and unpaid interest (including interest at the Default Rate, from the date of the actual default notwithstanding the date the Written Notice is provided to the Borrower), fees and costs, through the date of payment, shall, in addition to default by Borrower under the Loan Documents as described above, automatically become due and payable upon  (i) the failure to cure any default as is set forth above, (ii) the confirmation of any plan of reorganization in the Bankruptcy Case unless the plan proposes to treat Lender's claims in the same manner as provided in this Commitment and the Loan Documents, or such other treatment as the Lender, in its sole and absolute discretion, may agree in writing, (iii) conversion of the Bankruptcy Case to a case under Chapter 7, (iv) appointment of a Chapter 11 trustee or examiner with expanded powers unless the Lender consents to such an appointment, (v) dismissal of the Bankruptcy Case, (vi) entry of an order granting relief from stay to any party with regard to any interest in real property or cash collateral of the estate of Borrower, (vii) entry of an order approving the transfer of any of the Collateral, or the actual transfer of any of the Collateral either voluntarily or by operation of law, to a party other than Lender and other than in the ordinary course of business, (viii) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to superpriority administrative status equal to or superior to that granted to Lender, or (ix) the institution of any foreclosure action with respect to any interest in real property of the estate of Borrower.

**CONDITIONS:**        Lender's obligations to close the Loan or to make the Initial Advance and the Final Advance shall be expressly subject to the following conditions precedent:

A.        On or before **April 25, 2011**, the Borrower shall have filed with the Bankruptcy Court a motion, in form and substance acceptable to Lender in its discretion, requesting (i) approval of the Loan as described herein and (ii) authority to grant the Lender the lien priorities described herein with respect to the Collateral (the "Motion"). A copy of this Commitment shall be attached to the Motion as filed and served on all parties in interest required to be so served. The Motion shall have been served on all creditors of the Borrower, the general contractor with respect to the

8

Project, if applicable, all parties with whom the Borrower has an executory contract with respect to the Project or any of the other Collateral, all taxing authorities having or asserting authority over the Borrower, and all entities who have filed a Notice to Owner with reference to the Project or any other component of the Collateral.

B.    The Bankruptcy Court shall have entered the Final Order approving this Loan under the terms set forth in this Commitment, finding that the Borrower is the owner of the Collateral and the documentation for the same, which Final Order shall have a copy of this Commitment attached thereto and incorporated in its entirety by reference, and shall be in form and substance acceptable to Lender in its sole discretion, and which Final Order shall not have been appealed, modified, stayed, vacated, or reversed.

C.    With regard to all Collateral which is real property, (i) issuance of a commitment for a lender's title insurance policy (the "Title Commitment"), issued by Lender's counsel from a title company acceptable to Lender (the "Title Company"), in form and substance satisfactory to Lender in its sole and absolute discretion, insuring the Lender's interest in the Collateral is consistent with the terms of this Commitment, without any exception, *inter alia*, for claims of mechanic's liens or unpaid Notices to Owner; and (ii) delivery to Lender of a property insurance binder approved by Lender showing that the improvements are insured, at Borrower's expense, in an amount not less than the greater of (a) their respective fair market value or (b) their respective replacement cost, and showing Lender as additional insured and loss payee. The cost of all of the foregoing shall be borne by Borrower.

D.    On or before **ten (10) days following the filing of the Motion with the Bankruptcy Court for approval of the Loan**, or as soon thereafter as the Bankruptcy Court will consider the matter after Borrower has asked for expedited consideration, Borrower shall have (i) obtained an order of the Bankruptcy Court approving the Loan, in form and content consistent, in Lender's sole and absolute discretion, with the terms of this Commitment, and (ii) the Borrower shall have executed a definitive loan agreement, notes, deeds of trust or mortgages, security agreements, and other documentation and customary certificates, consistent with the terms set forth herein and otherwise in form satisfactory to Lender and its counsel; unless any such conditions are waived in Lender's sole and absolute discretion. The Final Order of the Bankruptcy Court approving such documents shall not have been appealed, stayed, modified or amended, and shall be in form and substance acceptable to Lender, and shall be made effective immediately without any stay of the effect of

9

such Final Order so as to permit, in Lender's sole discretion, immediate funding within the provisions and protections of 11 U.S.C. §364.

In addition, Borrower shall have provided Lender evidence satisfactory to Lender and the Title Company that all agreements and documents relating to the Loan have been executed by the Borrower and the party executing such documents has the authority to bind the Borrower. Additionally, Borrower shall provide such other legal opinions as may be required to ensure the Loan complies will all applicable state and federal legal requirements. All of the foregoing loan agreements, notes, deeds of trust or mortgages, escrow agreements, security agreements, other documentation and customary certificates, and this Commitment, shall be referred to herein, collectively, as the "Loan Documents." Each of the Loan Documents shall be in form and substance satisfactory to the Lender and Lender's counsel in their sole discretion.

E.      The Borrower shall have complied with all of the terms of the Loan Documents and there shall exist no event of default or set of circumstances which given the expiration of time or the giving of notice would give rise to an event of default under the Loan Documents.

F.      The Borrower, at its sole cost and expense, shall provide a survey or "update" of the existing survey of the Collateral, certified in accordance with ALTA standards to Lender and the Title Company prepared by a surveyor licensed by the State of Colorado, where such real property is located, showing such real estate to be free of material encroachments, overlaps and other survey defects, all in accordance with Lender's and Title Company's survey requirements.

G.      All parties claiming liens in the Collateral and all creditors of the Borrower, the general contractor with respect to the Project, if applicable, all parties with whom the Borrower has an executory contract with respect to the Collateral and all entities who have filed a Notice to Owner with reference to the Collateral shall have received notice of the Motion and the hearing thereon, and (a) all such parties shall have consented to, or shall not have objected to, the Loan and entry of the Final Order of the Bankruptcy Court approving the Loan, or (b) any objections of parties in interest shall have been specifically overruled in their entirety in the Final Order of the Bankruptcy Court approving the Loan.

H.      This Commitment is subject to and conditioned upon the accuracy of all information, representations, exhibits and other materials submitted with or in support of the Loan request and there must be no adverse change in the condition, business or prospects of the Collateral

10

or the Borrower prior to the disbursements of funds or during the term of the Loan.

I.     This Commitment is subject to and conditioned upon the receipt and satisfactory review of the due diligence materials, including, without limitation, the items set forth in C. and F. of this Section.    After conducting its due diligence including a physical inspection of the Collateral, Lender, in its sole discretion, may choose not to enter into the Loan and terminate this Commitment, for any reason whatsoever. Without being limited by the foregoing, the Parties hereto recognize that the Lender's willingness to fund the Final Advance is further conditioned upon a full due diligence review of the Project (hereafter the "Full Due Diligence Review"), that the costs associated with that full review will be funded, in part, from the Initial Amount, and that the comprehensive nature of that review will be time consuming. Accordingly, within fourteen business days following the entry of the Order authorizing the Initial Advance, the Lender, at its sole discretion, may choose to terminate this Commitment with respect to the Final Advance following the Full Due Diligence Review, for any reason whatsoever, and shall deliver to Borrower in writing notice of its election to withdraw and terminate the Commitment with respect to the Final Advance. The election of Lender not to deliver written notice of the election to withdraw within fourteen business days following the entry of the Order authorizing the Initial Advance, shall not be construed as a waiver or satisfaction of all other requirements set forth in this CONDITIONS section as prerequisites, in Lender's sole discretion, to its obligation to close the Loan with respect to the Final Advance or to make each advance of the Loan with respect thereto.

J.     Borrower shall have demonstrated and/or Lender, in its sole discretion, shall have determined that there are no environmental, land use, zoning or other governmental or regulatory issues that will adversely impact the Collateral in its current "as is, where is" condition, the operations of Borrower or its ability to repay the Loan.  Borrower shall have provided the Lender with any and all reports on such issues in its possession.  Said reports shall be in form and substance satisfactory to Lender in its sole discretion.

K.     The Maximum Loan Amount, together with the Excepted Liens, shall not exceed fifty-percent (50.00%) of the "as completed" value of the Collateral as determined by Lender in its sole and absolute discretion.

L.     Borrower shall demonstrate the capability based upon its business plan, in the sole and absolute discretion of the Lender, of repaying the Loan on the Maturity Date.

M.     Lender, at its discretion, may waive any one or more of the above-described conditions, but no such waiver shall be effective against Lender unless in writing and signed by an authorized representative of Lender.

**FEES & COSTS:**     A.     Concurrent with the first disbursement attributable to the Initial Advance and concurrent with the first disbursement attributable to the Final Advance of the Loan, from the proceeds of each such advance, Borrower shall pay to Lender a commitment fee calculated as four percent (4.00%) of the aggregate amount of the Initial Advance and the aggregate amount of the Final Advance (the "Commitment Fee"), due and fully earned at closing following entry of the Final Order applicable to the Initial Advance and Final Advance, respectively. For the avoidance of doubt, the amount of the Initial Advance shall not be included in the calculation of the Commitment Fee due with respect to the Final Advance. In addition, at the Initial funding of the Initial Advance and the Final Advance and with each subsequent disbursement of the Loan, Borrower shall pay (a) all of Lender's reasonable costs and expenses related to the Loan or to the Bankruptcy Case (including Lender's reasonable travel and lodging expenses) and out-of-pocket expenses and the fees and expenses of Lender's counsel, all accrued as of such closing (which shall automatically become part of the Loan), (b) all recording costs (including mortgage or intangible taxes) for filing the recordable Loan Documents, and (c) the cost of the Lender's Mortgagee Title Insurance Policy (the "Title Policy"), and the cost of the survey of the real property, all of such costs under (a)-(c) being collectively referred to as the "Closing Costs".

B.     In addition, the Borrower shall pay to Lender the reasonable fees and expenses (including reasonable travel expenses, if any) of Lender's counsel, arising subsequent to closing in connection with this transaction and the representation of Lender in the Bankruptcy Case, which such reasonable fees and expenses shall be deemed a part of the Loan secured by the Collateral.  The reasonable legal fees of Lender's counsel shall be calculated on a time-spent basis, based upon the standard hourly rates of Lender's counsel generally charged to clients of that firm for similar matters and shall be paid from proceeds of the Loan.

C.     Borrower agrees that the Loan shall be without cost to Lender. Borrower assumes liability for and will pay all costs and expenses required to satisfy the conditions hereof and the making of the Loan as

12

provided hereunder (including the costs of the Title Policy and the survey). Such costs and expenses shall be paid as provided hereunder, or upon demand if the Loan does not close or if this Commitment is terminated.

**ACCEPTANCE OF COMMITMENT:**   Upon acceptance and execution of this Commitment by Borrower, Borrower shall cause to be paid to Lender from funds other than those of Borrower a loan application fee in the amount of $10,000 ("Application Fee"). The Application Fee shall include and be applied toward payment of Lender's out-of-pocket due diligence and inspection costs, including, but not limited to, any expenses incurred by Lender, and Lender's travel, lodging and other out-of-pocket expenses incurred through to the date of approval of the Loan by the Bankruptcy Court. The Application Fee shall be earned upon receipt. Lender's out-of-pocket costs associated with the post-approval administration and monitoring of the Loan and the Borrower's compliance with the terms of the Loan Documents shall be added to the Loan as such expenses are incurred.

Upon entry of the Order approving the Initial Advance, the Borrower shall cause to be paid to Lender from funds other than those of Borrower an additional loan application fee in the amount of $5,000 ("Additional Application Fee"). The Additional Application Fee shall include and be applied toward payment of Lender's out-of-pocket due diligence and inspection costs, including, but not limited to, any expenses incurred by Lender, and Lender's travel, lodging and other out-of-pocket expenses incurred before and subsequent to the date of approval of the Initial Advance by the Bankruptcy Court. The Additional Application Fee shall be earned upon receipt. Lender's out-of-pocket costs associated with the post-approval administration and monitoring of the Loan and the Borrower's compliance with the terms of the Loan Documents shall be added to the Loan as such expenses are incurred.

If this Commitment is not terminated by Lender under subparagraph A. of the section hereof entitled CONDITIONS, and upon entry of the Final Order approving the Loan, subject to the terms of this Commitment, a stand-by commitment loan fee in the amount of two percent (2.00%) of the Maximum Loan Amount ("Stand-by Fee") shall be earned by the Lender as follows:

The Stand-by Fee shall be deemed earned by the Lender if, after entry of the Final Order approving the Loan, any of the following events occur: (i) the Borrower elects to not enter into the Loan under this Commitment for any reason, (ii) the Bankruptcy Court authorizes the Borrower to

obtain financing from an existing creditor or other third party lender in lieu of Lender and the financing is provided by such existing creditor or other third party lender, or (iii) the Borrower fails to satisfy any of the material Conditions contained in this Commitment (each of the foregoing being defined as a "Triggering Event"). Upon the occurrence of a Triggering Event, the Lender shall have an allowed administrative expense claim in the Bankruptcy Case for the amount of the Stand-by-Fee, and the Lender and the Borrower shall be relieved of any further obligation under this Commitment; provided, however, that in the event the Borrower obtains financing from another lender, creditor or third party, the Stand-by-Fee shall be paid in full, in cash, at the closing of such loan(s). If the Loan is not made by Lender as a result of Lender's election to not enter into the Loan, then the Stand-by Fee shall not be recorded as an administrative expense claim in the Bankruptcy Case and the Lender shall receive no other compensation for its services (other than the Application Fee and the Legal Fee Deposit), and the Lender shall then have no further obligation to the Borrower under this Commitment.

**LEGAL FEE DEPOSIT:**    Upon acceptance and execution of this Commitment by Borrower, Borrower shall cause to be paid to Lender's counsel from funds other than those of Borrower a $10,000 legal fee deposit (the "Legal Fee Deposit") to be paid to Lender's attorney simultaneously with Borrower's execution of this letter. The Legal Fee Deposit, which shall not be construed as a cap, will be available to Lender's attorney to be used to defray costs and attorneys' fees associated with closing the Loan. To the extent that the Legal Fee Deposit is insufficient, any remaining amount due shall be disbursed to Lender or its counsel as a Closing Cost, at the closing of the Initial Advance.

Upon entry of the Order authorizing the Initial Advance, Borrower shall cause to be paid to Lender's counsel from funds other than those of Borrower an additional $5,000 legal fee deposit (the "Additional Legal Fee Deposit"). The Additional Legal Fee Deposit, which shall not be construed as a cap, will be available to Lender's attorney to be used to defray costs and attorneys' fees associated with closing the Loan. To the extent that the Legal Fee Deposit and the Additional Legal Fee Deposit are insufficient, any remaining amount due shall be disbursed to Lender or its counsel as a Closing Cost, at the closing of the Initial Advance and the Final Advance, as the case may be.

This letter will become a commitment once signed by all parties and returned with the $10,000 Application Fee and $10,000 Legal Fee Deposit. This offer by Lender will expire, **April 22, 2011 @ 5:00 PM,**

14

**Eastern Daylight Savings Time,** time being of the essence. Lender shall have no obligation with respect to the Loan unless and until this commitment letter is fully executed and received by Lender together with the Application Fee and Legal Fee Deposit, and if the Commitment is not terminated under subparagraph A. of the section hereof entitled CONDITIONS. Said $15,000 Application Fee and $15,000 Legal Fee Deposit shall be paid in accordance with the following wire instructions:

**Wire instructions:**

**WIRE INSTRUCTIONS:**
**EFO FINANCIAL GROUP, LLC**
**AMOUNT: $15,000 (Application Fee)**
WIRE TO: BBVA COMPASS
ABA NO: 113010547
ACCOUNT OF: EFO FINANCIAL GROUP, LLC
Acct NO: 2526555107

**WIRE INSTRUCTIONS:**
**WIRE TO: FIFTH THIRD BANK**
**ABA NO: 042000314**
**ACCOUNT OF: LOUIS X. AMATO, P.A., TRUST ACCOUNT**
**ACCOUNT NO: 7430837109**

**CLOSING:**  The closing on the Loan shall take place as soon as practical after satisfaction of the conditions contained herein, including without limitation, entry of the Final Order. Each successive disbursement on the Loan shall take place upon satisfaction of the conditions contained herein.

**ASSIGNMENT:**  Lender may assign any or all of its obligations and rights hereunder to one or more assignees or participants, and may collaterally assign the Loan Documents to Lender's lender under any existing or future loan arrangement. Lender intends to bring participants into this transaction either as assignees or indirectly as lenders to Lender. Borrower consents to Lender's sale or assignment of all or a portion of the Loan, and Borrower agrees to execute any and all agreements and other documents reasonably requested by Lender and Lender's lenders to formalize such assignments of or participations in the Loan.

**USURY:**  This Commitment is subject to the express condition that at no time shall the Borrower be obligated or required to pay interest at a rate which could subject Lender or its assignees to either civil or criminal liability as a result of being in excess of the maximum rate which the Borrower is

15

permitted by law to contract or agree to pay. If by the terms of this Commitment or the note evidencing the Loan, the Borrower is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest hereunder and/or under the note shall be deemed to be immediately reduced to such maximum rate and interest payable shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal balance or, if the Loan has not closed shall be void, and if Lender deems it a hardship to close the Loan under usury statutes, all fees paid to Lender shall be refunded and this Commitment shall be null and void.

It is also hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

It is further understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at the Default Rate's effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by applicable state or federal law.

**CONFIDENTIALITY:**   This Commitment is confidential. Until such time as the Commitment has been executed by each of the Borrower and the Lender, the Borrower shall not disclose the terms of this Commitment to any third party other than its officers, directors, professionals and advisors, unless otherwise required by Bankruptcy Court order following a hearing on notice to the Lender. This provision shall survive the termination of this Commitment.

**SURVIVAL OF**
**COMMITMENT:**   A copy of this Commitment shall be attached to, and incorporated into, each and every order entered by the Bankruptcy Court with regard to the Loan. To the extent not inconsistent with the other Loan Documents, this Commitment and all of the terms and conditions contained herein shall

survive the closing of the Loan and shall remain binding on the Borrower and Lender as part of the Loan Documents, provided, however, that if there should exist any disagreement between the terms of this Commitment and the terms of any of the other Loan Documents, the terms of the Loan Documents shall control.

**EXECUTION AND RELIANCE ON COUNSEL:**

This Commitment may be executed in counterparts which, taken together, shall constitute one original. This Commitment is for the benefit of the Borrower only and may not be assigned except upon the prior written consent of Lender, which consent may be withheld for any reason or for no reason. No party other than the Borrower or a consented to assignee may rely upon the terms and conditions of this Commitment. This Commitment is executed by an individual strictly in his capacity as a representative of the Lender. By acceptance of this Commitment, Borrower agrees that no representative, member, partner, shareholder, employee or agent of the Lender shall be personally liable for the payment of any claim or performance of any obligations hereunder. This Commitment will be governed by and construed in accordance with the laws of the State of Colorado and of the United States, without regard to the principles of conflicts of laws thereof. **The Borrower had the benefit of advice of counsel in connection with the execution of this Commitment and the Loan contemplated hereby. This document has been negotiated at arm's length and in good faith between the Lender and the Borrower.**

**NON WAIVER:**

No failure or delay on the part of Lender to exercise any rights under the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right under the Loan Documents preclude any further exercise thereof, or the exercise of any other right. Each and every right or remedy granted under the Loan Documents or under any document delivered thereunder or in connection therewith or allowed to Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

**OTHER:**

Borrower has represented to the Lender that it intends to use a portion of the proceeds of the Loan for the operation of the business, maintenance and upgrades to the Project prior to the Borrower submitting a plan of reorganization ("Plan") for its emergence from bankruptcy. Lender has relied upon this representation in extending this Commitment. The Final Order authorizing the Loan shall expressly provide that the Bankruptcy Court shall retain the fullest jurisdiction over both this Loan and the Borrower until such time as the Loan is irrevocably

17

repaid to the Lender, in full, in cash. The Plan shall not modify, alter or impair the liens and claims of the Lender. The Final Order shall also contain such waivers as Lender shall require entitling the Lender to immediately foreclose and otherwise enforce rights against the Borrower and the Collateral should the Borrower, either voluntarily or involuntarily, be subject of a subsequent case or proceeding under title 11 of the United States Code, or otherwise default under the Loan or Loan Documents.

As referenced in this Commitment, funding of the Loan is dependent upon, among other things, satisfactory negotiation of loan documentation between the Borrower and the Lender. The foregoing letter simply sets forth general terms and conditions upon which the Lender would be willing to make the Loan described herein. **This Commitment is not, in and of itself, a document that guarantees funding by the Lender to the Borrower in the amounts set forth herein. Only final loan documentation and satisfaction of the conditions set forth above will obligate the Lender to fund the Loan.** Any material deterioration of the financial condition of the Borrower or the condition of the Collateral between the execution of this Commitment and the closing of the Loan will relieve the Lender of any obligation on the part of the Lender to fund the Loan.

If you find this Commitment to your satisfaction, please execute a copy of this document in the space provided herein below and return the same to the undersigned. Please have the manager of the Borrower execute this Commitment to the Lender, upon the terms and conditions contained in this Commitment.

[Signature Page to Follow]

18

We appreciate this opportunity to respond to your financing requirements.  If you have questions regarding this letter, please call Mr. Renzo Renzi at (239) 449-1813.

Very truly yours,

**EFO Financial Group, LLC,**
a Florida limited liability company

By: _____
Renzo Renzi, Manager


**AGREED AND ACCEPTED**


**Clearwater Development Inc.,**
a Colorado corporation

By: _____

Name: _____

Title: _____

19

# EXHIBIT A

## BUDGET

| Initial Advance | |
|---|---|
| Operating & Development Expense | $317,300 |
| Chief Restructuring Officer | 25,000 |
| Legal Expense: Debtor | 25,000 |
| Legal Expense: Unsecured Creditors Committee | 50,000 |
| Marketing and Public Relations Expense | 10,000 |
| Reimbursement: Application & Legal Fee Deposit | 20,000 |
| Closing Costs | 11,684 |
| Commitment Fee | 23,365 |
| Interest Reserve (12-Months) | 81,778 |
| Loan Servicing Fee | 20,000 |
| **Maximum Loan Amount** | **$584,127** |

| Final Advance | |
|---|---|
| Operating & Development Expense | $1,012,019 |
| Consulting: Imprimis Corporation | 35,000 |
| Chief Restructuring Officer | 100,000 |
| Legal Expense: Debtor | 250,000 |
| Legal Expense: Unsecured Creditors Committee | 50,000 |
| Marketing and Public Relations Expense | 60,000 |
| Reimbursement: Application & Legal Fee Deposit | 10,000 |
| Closing Costs | 37,925 |
| Commitment Fee | 75,851 |
| Interest Reserve (12-Months) | 265,478 |
| **Maximum Loan Amount** | **$1,896,273** |

20

# EXHIBIT B

## LEGAL DESCRIPTION

<u>Collateral</u>: The Collateral for the Loan shall include the following:

(a)   The real property more particularly described on Exhibit B-1 attached hereto (the "Property"), together with all of the owner's right, title, interest, and privileges in  all (i) streets, ways, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the Property or the improvements thereon; (ii) strips or gores of real property between the Property and abutting or adjacent properties; and (iii) all water and water rights pertaining to the Property;

(b)   Any and all improvements of any kind or nature situated, placed, or constructed on the Property;

(c)   All fixtures, materials, supplies, equipment, systems, and apparatus, now or hereafter attached to, installed in, or used in connection with (temporarily or permanently) any of the Property or its improvements, including motors, engines, boilers, furnaces, pipes, cleaning, call and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, swimming pools, heating, ventilating, refrigeration, plumbing, laundry, lighting, generating, cleaning, waste disposal, transportation (of people or things, including but not limited to, stairways, elevators, escalators, and conveyors), incinerating, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and lighting, traffic control, waste disposal, raw and potable water, gas, electrical, storm and sanitary sewer, telephone and cable television facilities, and all other utilities whether or not situated in easements;

(d)   Any and all leases, master leases, subleases, licenses, concessions, and other agreements (whether written or oral, or now or hereafter in effect) which grant to third parties a possessory interest in and to, or the right to use or occupy, all or any part of the Property, including all security and other deposits;

(e)   All furniture, furnishings, machinery, goods, general intangibles, money, insurance proceeds, accounts, trademarks, trade names, copyrights, chattel paper, instruments, investment property, letter of credit rights, inventory, deposit accounts or other funds or evidences of cash, credit or indebtedness deposited by or on behalf of owner with any governmental agencies, boards, corporations, providers of utility services, public or private, including reimbursable tap fees, utility deposits, commitment fees and development costs, any awards, remunerations, reimbursements, settlements, or compensation heretofore made or hereafter to be made by any governmental authority pertaining to any of the Collateral, and all

other personal property of any kind or character which is now or hereafter situated in, on, or about the Property or used in or necessary to the complete and proper planning, development, construction, financing, use, occupancy, or operation thereof;

(f)    Any and all contracts, subcontracts, and agreements, written or oral, in any way relating to the construction of the improvements on the Property or the supplying of material (specially fabricated or otherwise), labor, supplies, or other services therefor, contracts, licenses, permits, and rights relating to living unit equivalents or other entitlements for water, wastewater, and other utility services whether executed, granted, or issued by a private person or entity or a governmental or quasi-governmental agency, which are directly or indirectly related to, or connected with, the development, ownership, maintenance or operation of the Property, whether such contracts, licenses, and permits are now or at any time thereafter existing; and

(g)    Any and all other rights of the owner (i) to develop and/or operate the Property as a commercial and/or residential project, as the case may be; (ii) in any financing arrangements relating to the financing of or the purchase of all or any portion of the Property by future purchasers; and (iii) in all other contracts which in any way relate to the use, enjoyment, occupancy, operation, maintenance, repair, management or ownership of the Property.

22

# EXHIBIT B-1

LEGAL DESCRIPTION

## SEE ATTACHED

PARCEL 1
LOTS 45, 46, AND LOTS 63 THROUGH 68, INCLUSIVE; BRIGHTWATER CLUB FILING 2,
ACCORDING TO THE PLAT RECORDED JUNE 20, 2005 AT RECEPTION NO. 919836, COUNTY OF
EAGLE, STATE OF COLORADO.

PARCEL 2
LOTS 1 THROUGH 4, BLOCK K, INCLUSIVE; LOT 11, BLOCK K; LOTS 16 AND 17, BLOCK K;
AND LOTS 23 THROUGH 40, BLOCK K, INCLUSIVE; BRIGHTWATER CLUB FILING 3,
ACCORDING TO THE PLAT RECORDED SEPTEMBER 14, 2005 AT RECEPTION NO. 929490,
COUNTY OF EAGLE, STATE OF COLORADO.

PARCEL 3
LOTS 2, 3, 5, 23, 24, AND LOTS 26 THROUGH 50, INCLUSIVE; BRIGHTWATER CLUB FILING
4, ACCORDING TO THE PLAT RECORDED APRIL 13, 2006 AT RECEPTION NO. 200609481,
COUNTY OF EAGLE, STATE OF COLORADO.

PARCEL 4
LOTS 1 THROUGH 49, INCLUSIVE; LOTS 54, 57, AND 59; BRIGHTWATER CLUB FILING 5,
ACCORDING TO THE PLAT RECORDED MAY 10, 2006 AT RECEPTION NO. 200612175, COUNTY
OF EAGLE, STATE OF COLORADO.

PARCEL 5
TRACTS A AND B, PARCELS C1 THROUGH C3, INCLUSIVE, PARCELS M AND N, AND TRACTS O
AND P, ALL IN BRIGHTWATER CLUB FILING 1, ACCORDING TO THE PLAT RECORDED MAY 18,
2005 AT RECEPTION NO. 916179, COUNTY OF EAGLE, STATE OF COLORADO.

PARCEL 6
TRACTS AA THROUGH LL, INCLUSIVE; BRIGHTWATER CLUB FILING 2, ACCORDING TO THE
PLAT RECORDED JUNE 20, 2005 AT RECEPTION NO. 919836, COUNTY OF EAGLE, STATE OF
COLORADO.

PARCEL 7
TRACTS 3A THROUGH 3F, INCLUSIVE; BRIGHTWATER CLUB FILING 3, ACCORDING TO THE
PLAT RECORDED SEPTEMBER 14, 2005 AT RECEPTION NO. 929490, COUNTY OF EAGLE,
STATE OF COLORADO.

PARCEL 8
TRACTS MM THROUGH SS, INCLUSIVE; BRIGHTWATER CLUB FILING 4, ACCORDING TO THE
PLAT RECORDED APRIL 13, 2006 AT RECEPTION NO. 200609481, COUNTY OF EAGLE, STATE
OF COLORADO.

PARCEL 9
TRACTS TT, UU, AND VV, BRIGHTWATER CLUB FILING 5, ACCORDING TO THE PLAT RECORDED
MAY 10, 2006 AT RECEPTION NO. 200612175, COUNTY OF EAGLE, STATE OF COLORADO.

PARCEL 10
GOLF CLUB PLAY AND MAINTENANCE AND OPERATIONS EASEMENT AS CREATED BY
DECLARATION RECORDED SEPTEMBER 8, 2005 RECEPTION NO. 928911.

Form LEGAL.POL.EXHIBIT

200728702  54 OF 57

PARCEL 11
PEDESTRIAN AND GOLF CART PATH EASEMENT AS CREATED BY DECLARATION RECORDED AUGUST 2, 2005 RECEPTION NO. 924671.

TOGETHER WITH THE PERPETUAL AND NON-EXCLUSIVE EASEMENTS AND RIGHTS OF WAYS AS CONTAINED ON THE FOLLOWING PLATS RECORDED IN THE EAGLE COUNTY RECORDS:

BRIGHTWATER CLUB FILING 1 RECORDED MAY 18, 2005 AT RECEPTION NO. 916179,

BRIGHTWATER CLUB FILING 2 RECORDED JUNE 20, 2005 AT RECEPTION NO. 919836,

BRIGHTWATER CLUB FILING 3 RECORDED SEPTEMBER 14, 2005 AT RECEPTION NO. 929490,

BRIGHTWATER CLUB FILING 4 RECORDED APRIL 13, 2006 AT RECEPTION NO. 200609481,

BRIGHTWATER CLUB FILING 5 RECORDED MAY 10, 2006 AT RECEPTION NO. 200612175.

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 21, 2011, I served by depositing same in the United States mail, first class postage prepaid a copy of the documents entitled **MOTION SEEKING EXPEDITED ENTRY OF ORDERS, notice and proposed orders** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed.R.Bankr.P. and these L.B.R. at the following addresses:

| | |
|---|---|
| United States Trustee's Office<br>Attn: Leo M. Weiss<br>999 18th Street, Suite 1551<br>Denver, Co 8020 | Clearwater Development, Inc.<br>4000 Gypsum Creek Rd.<br>Gypsum, CO 81637 |
| James DeFrancia<br>PO Box 12393<br>Aspen, CO 81612 | Custom Concepts, LLC<br>C/O Rick G Hermes<br>PO Box 2633<br>Edwards, CO 81632 |
| Kennedy Funding, Inc.<br>Attn: Jeffrey Wolfer/Tony Petruccello<br>Two University Plaza, Suite 402<br>Hackensack, NJ 07601 | Brightwater Club POA<br>P.O. Box 993<br>Eagle, CO 81631 |
| Todd Thomas<br>1417 White Hawk Ranch Drive<br>Boulder, CO 80303 | Imprimis Corp.<br>P.O. Box 1856<br>Palm Desert, CA 92261 |
| Guaranty Bank & Trust Co.<br>PO Box 5847<br>Denver, CO 80217-5847 | Simplot Partners<br>Dept. #1136<br>Los Angeles, CA 90084-1136 |
| US Bank<br>PO Box 790401<br>St Louis, MO 63179-0401 | Orval And Dorothy Paul<br>11404 East Imperial Highway<br>Norwalk, CA 90650 |
| L. Hatle Trust<br>PO Box 1856<br>Palm Desert, CA 92261 | Orval A. Paul Annuity Trust<br>11404 E. Imperial Hwy<br>Norwalk, CA 90650 |
| Malcolm Gray<br>11407 St. Germain Way<br>Houston, TX 77082 | Jay And Deborah Harper<br>400 Woodland Drive<br>Pauls Valley, OK 73075 |

Blakeslee Advertising & Marketing
916 North Charles Street
Baltimore, MD 21201

Benjamin, Bain & Howard, LLC
P.O. Box 370509
Denver, CO 80237-0509

Larry And Susan Boothby
4270 South Bellaire Circle
Englewood, CO 80113

Saliesh And Bhavna Patel
8584 155th Place North
Palm Beach Gardens, FL 33418

Eagle County Treasurer
P.O. Box 479
Eagle, CO 81631-0479

Cole Schotz Meisel Forman & Leonard PA
Attn: Michael R. Leighton, Esq.
25 Main Street
Hackensack, NJ 07602-0800

KRC-HLT Corporation
Dba Formost Construction
P.O. Box 559
Temecula, CA 92593

Robert Trent Jones, II, LLC
705 Forest Avenue
Palo Alto, CA 94301

Sport-Haley, Inc
Dba Ben Hogan Apparel Group
4600 East 48th Avenue
Denver, CO 80216

Internal Revenue Service
Centralized Insolvency Operations
PO Box 21126
Philadelphia, PA 19114-0326

Don Dotson And Mary Palmtag
P.O. Box Box 4105
Gypsum, CO 81637

Jim Murton
10330 SW 59 Avenue
Miami, FL 33156

Leslie And Faith Lerner
475 Split Rock Road
Syossest, NY 11791

Cook & Solis Construction, Inc.
P.O. Box 301491
Escondido, CA 92030

John Deere Credit
P.O. Box 650215
Dallas, TX 75265-0215

Ronald R. Peterson, Trustee
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654-3456

La Tierra de Esmeralda Incorporated
Dba Emerald Sod Farms
P.O. Box 68
Brighton, CO 80601

SEMA Golf, LLC
7353 South Eagle Street
Centennial, CO 80112

Colorado Dept. of Revenue
1525 Sherman St., 7th floor
Denver, CO 80203

_/s/ Tami Childers_
Tami Childers, Legal Assistant

10